IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2022

**TERRY WAYNE HENSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for McNairy County**
**No. 3671          J. Weber McCraw, Judge**

───────────────────────────────

**No. W2021-01432-CCA-R3-PC**

───────────────────────────────

A McNairy County jury convicted the Petitioner, Terry Wayne Henson, of two counts of rape of a child, one count of incest, and one count of violating the sex offender registry requirements. The trial court sentenced him to an effective sentence of thirty-five years of incarceration. This court affirmed the Petitioner's convictions on direct appeal. *State v. Terry Wayne Henson*, No. W2019-00462-SC-R11-CD, 2020 WL 6317113 (Tenn. Crim. App., at Jackson, Oct. 28, 2020), *Tenn. R. App. P. 11 application denied* (Tenn. Mar. 23, 2021). The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel was ineffective in several regards. The post-conviction court held a hearing, after which it denied the petition. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Bo Burk, District Public Defender; Rickey W. Griggs, Assistant District Public Defender, Somerville, Tennessee, for the appellant, Terry Wayne Henson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Mark Edward Davidson, District Attorney General; and Lisa Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

───────────────────

[1] The Honorable John Everett Williams died September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this Court.

This case arises from the Petitioner's sexual abuse of his eight-year-old biological daughter, S.M.[2] and S.M.'s nine-year-old half-sister, A.G.H., during an October weekend the two girls spent with the Petitioner at his house trailer just prior to Halloween of 2016.

## A. Trial

In our opinion deciding the Petitioner's direct appeal of his convictions, we summarized the evidence presented against him at trial as follows:

> The State's first witness at trial was Officer Dena Heathcock of the Jackson Police Department, formerly employed as a patrol officer with the McNairy County Sheriff's Department, who testified that on October 30, 2016, while in her former position, she was dispatched to meet with the victims and their mother at the courthouse/jail complex in response to a "[f]ondling" call. She said she took the victims' statements and noted in her report that A.G.H. had a bruise on her right breast. On cross-examination, she acknowledged that she could not recall any specific details about the bruise. On redirect examination, she recalled that there was one other person, "Brandi," present with the victims and their mother when she met with them at the complex.

> Brandi Miller, the victims' former sister-in-law, testified that A.G.H. made a revelation to her about sexual abuse after they picked her up from her visit with the [Petitioner]. She stated that they immediately reported the abuse to law enforcement, driving first to the Hardin County jailhouse and from there to the McNairy County Courthouse complex to speak with a female officer. She was present when A.G.H. showed the officer her breast, and she observed that the breast was red. On cross-examination, she denied that she coached the victims on what to say to the officer.

> Sexual Assault Nurse Examiner Mary Jane Cole, who examined both victims in the early morning hours of October 31, 2016, testified that S.M. reported that her father had "pinched [her] butt" and that he "puts his nu-nu, his bad part, in [her] nu-nu." S.M. showed her what she meant by "nu-nu" by pointing to the crotch area of a toy and to her own crotch area. Her physical examination of S.M., which involved gently pulling apart the outer lips, or labia majora, of S.M.'s vulva, revealed mild redness in S.M.'s external genitalia.

---

[2]In accordance with the policy of this court, we refer to the minor victims by their initials only.

Nurse Cole testified that A.G.H. reported that the [Petitioner]: "put his thingy in [her] butt"; "put his thingy to [her] front part," which hurt; put his finger in her "front private"; put his hand on her breast, which caused her pain; and kissed her on the mouth. . . . She asked what A.G.H. meant by the [Petitioner] putting his finger in her private, and A.G.H. told her that the [Petitioner's] fingers moved "in and out[.]" . . . Her physical examination of A.G.H. was limited due to A.G.H.'s extreme discomfort and pain, even after she applied Lidocaine jelly, but she was able to observe "[s]evere redness throughout . . . [A.G.H.'s] whole vestibule, around the urethra, around the hymenal tissue, in the labia minora, on the outside, the labia majora."

On cross-examination, she testified that she did not see any acute injury on S.M. and saw no noticeable redness on or around A.G.H.'s buttocks. She said she collected two buccal swabs from S.M., two buccal swabs from A.G.H., two swabs from around the outside of A.G.H.'s anus, and two swabs from A.G.H.'s labia majora. She had no information of whether any foreign DNA was found on any of the swabs. She acknowledged that either poor hygiene or an infection could account for the redness in A.G.H.'s genital area but said that the child's mother gave no indication that A.G.H. had any prior issues with irritation of her genitalia. She acknowledged that she was unable to determine whether penetration had occurred in either child.

Ten-year-old S.M. testified that the [Petitioner], her father, touched her in a bad way one weekend when she was staying with him at his house and watching the movie "Bad Teacher." Referring to the [Petitioner's] penis as his "bad part," she said that the [Petitioner], who was lying down on the couch, unzipped his pants, pulled out his penis, and moved her so that she was sitting on top of his penis. The [Petitioner] did not remove her clothes but he pushed his penis several times against her buttocks. Although she was not clear in her testimony, she indicated that the [Petitioner] either pushed his penis through the leg opening of her panties into her vagina or her anus or pushed his penis, covered by the material of her panties, into her vagina or her anus, testifying, "My clothes was on but you can feel it go through." She further testified that it felt as if the [Petitioner] penis was inside of her and that it was "coming into [her] butt." His penis felt "[l]ike a mountain," and the [Petitioner] was "moving everywhere." The [Petitioner's] penis hurt her and she asked him to stop, but he continued. She felt "[a] little bit of pee" coming out of his penis and "into [her] butt" before the [Petitioner] finally stopped. She said she told her sister-in-law, Brandi, about what the

3

[Petitioner] had done and that she later went to the Carl Perkins Center for the Prevention of Child Abuse where a woman examined her.

On cross-examination, S.M. testified that the [Petitioner] removed both her t-shirt and her pants, leaving her underwear on. She reiterated that the incident happened at the [Petitioner's] house. She could not recall what time of day it occurred or how old she had been at the time. She said no one else was in the home at the time.

On redirect examination, S.M. testified that a similar incident happened more than once and agreed that she might have been confusing the two incidents when she testified on direct examination that her clothes were on and on cross-examination that her clothes were off. She also agreed that her sister was at home on some of the occasions when "bad things happened" at the [Petitioner's] home.

Lieutenant Brad Johnson of the McNairy County Sheriff's Department identified a certified copy of the [Petitioner's] Georgia conviction for child molestation, as well as the "Tennessee Sexual Offender/Violent Sexual Offender Registration/Verification/Tracking Form, signed by the [Petitioner] on August 8, 2016, in which the [Petitioner] acknowledged receipt of the registry rules he was required to follow, including the prohibition against being alone with a minor.

Eleven-year-old A.G.H. testified that on an overnight visit with the [Petitioner] at his house trailer in Michie just before Halloween, the [Petitioner] told her to go into S.M.'s bedroom, where he pushed her down on the bed, pulled down her pants, and touched her breast and her private part with his finger.

She said the [Petitioner] put his fingers inside her, which made her feel "awkward" and "weird." The [Petitioner] then unzipped his pants, pulled out his private part, pushed it inside her private part, and rubbed against her, which hurt her. The [Petitioner] also tried to put his private part inside her buttocks, but she squeezed her buttocks together to stop him.

A.G.H. testified that she asked the [Petitioner] to stop, but he continued until his girlfriend, who was cooking in the kitchen, called for him to "come and eat." She said S.M. was playing with dolls in the living room at the time. She identified on anatomical drawings what she meant by her and the [Petitioner's] respective private parts. She testified that the

4

[Petitioner] dropped her and S.M. off at the courthouse at about 8:30 p.m., where their mother and Brandi picked them up. When she got home, she told Brandi and her brother what had happened.

On cross-examination, A.G.H. testified that at the time of the incident, she was wearing leggings and no underwear because her underwear was dirty. She said the [Petitioner] pulled her leggings down to her knees and unzipped his pants. The [Petitioner] was not wearing a shirt or any underwear. The [Petitioner] pinched her breast by sliding his arm underneath her shirt. She said the incident occurred in the evening approximately two years earlier, when she was nine. On redirect examination, she testified that the incident happened on the same weekend in which she talked to a police officer and went to a hospital for a physical examination.

The victims' mother, called as a witness by the defense, testified that her romantic relationship with the [Petitioner] had ended approximately three years before the date of trial. She acknowledged having told the judge in the general sessions court that she did not believe that the [Petitioner] would harm the victims. She stated, however, that she now believed the victims' allegations. On cross-examination, she testified that although she did not believe the victims when she first learned of the abuse, she had immediately taken them to be interviewed by law enforcement and to the hospital for physical examinations.

The forty-nine-year-old [Petitioner] testified that he had never been alone with A.G.H. and denied he had ever inappropriately touched either victim or behaved inappropriately around them. On cross-examination, he testified that he had been alone with S.M. and reiterated that he had never been alone with A.G.H., although he had been in the room with only A.G.H. and S.M. when S.M. was asleep.

Lynn Baker, owner of a construction company and the [Petitioner's] employer, testified that he had observed that the victims appeared to be "crazy" about the [Petitioner]. He described the [Petitioner] as an excellent employee and said that the [Petitioner] informed him of his Georgia criminal conviction on the day that he hired him.

*Henson*, 2020 WL 6317113, at *2-3. Based upon this evidence, the jury convicted the Petitioner of two counts of rape of a child, one count of incest, and one count of violating the sex offender registry requirements. The trial court sentenced him to an effective

sentence of thirty-five years of incarceration.  This court affirmed the Petitioner's convictions on appeal.  *Id.*

## B. Post-Conviction Hearing

The Petitioner filed a timely petition for post-conviction relief.  In it, he alleged that he received the ineffective assistance of counsel.  He alleged that his trial counsel ("Counsel") failed to interview the two victims, failed to conduct an appropriate investigation, failed to retain a qualified medical expert, and failed to engage in meaningful plea negotiations.  The post-conviction court held a hearing on the petition, during which the parties presented the following evidence:

Counsel testified that the Petitioner retained him shortly after the Petitioner's arraignment.  Counsel understood that the Petitioner alleged that he failed to have an investigator interview the two child witnesses.  Counsel explained that both children had been forensically interviewed in a thorough manner.  Counsel had a copy of that statement, and both girls testified at trial, giving him the opportunity to cross-examine them.  Counsel said that he did not believe that any further pretrial interviews would have changed his cross-examination.  Counsel additionally said that, as a matter of strategy, he did not want the children to rehearse their statements before trial, given that so much time had passed between the incident and the trial.

Counsel also responded to the Petitioner's allegation that he did not adequately investigate the names of witnesses given to him by the Petitioner.  Counsel said that he contacted one of those witnesses listed, "Ms. Alexander," who recounted that she was the parent of a male child who was a prior victim of a sexual offense where the Petitioner was the Defendant.  Counsel felt adamantly that this witness should not testify.  Counsel noted that, at the time of the offense involving these two girls, the Petitioner was on the sex offender registry for sexual offenses against "Ms. Alexander's" son.

The Petitioner also provided Counsel with the name of his ex-girlfriend as a witness. The Petitioner was uncertain how to contact his ex-girlfriend, and Counsel ultimately decided that the ex-girlfriend's testimony might do more harm than good because she could corroborate the victims' testimony about being at the Petitioner's home on the dates in question.

The other name that the Petitioner provided to Counsel, Mr. Lynn Baker, was the Petitioner's employer.  Mr. Baker only had "positive things" to say about the Petitioner, including that he was a "good worker."  Counsel noted, however, that Mr. Baker was not in the home at the time of the incident.  As such, Mr. Baker did not have information necessarily relevant to the offenses.  Regardless, Counsel called Mr. Baker at trial and at

6

sentencing. Counsel said he did not call the Petitioner's mother because she would clearly have been biased and she was not present at the time or place of the offenses.

Counsel acknowledged that the Petitioner claimed that Counsel failed to retain a qualified medical doctor to conduct a physical rape examination of the two victims. Counsel noted that a nurse at Jackson General Hospital, Mary Cole, had conducted a rape examination on the children. Counsel said that Nurse Cole conducted what appeared to be an unbiased and thorough examination, and Counsel had the opportunity to cross-examine her. Further, the incident occurred in October 2016, and Counsel was retained in June of 2017. Therefore, he failed to see how a medical examination almost a year later would have been beneficial. Counsel said he reviewed the medical information with the Petitioner.

Counsel testified that he attempted to get a plea offer from the State's attorney. Counsel said that he met with the State's attorney several times, always seeking to get a better offer, and he took the offer to the Petitioner. The Petitioner declined the offer and chose to go to trial.

During cross-examination, Counsel testified that he met with the Petitioner five or six times out of court and five or six times before or after court appearances. Counsel said that he did not specifically recall the Petitioner asking him to talk to the Petitioner's mother. Counsel acknowledged that there was a discrepancy in dates of when the incident occurred, and his trial strategy included attempting to get the victims to testify the incident occurred on the date in the indictment that they were not with the Petitioner. He did not recall, however, that the Petitioner's mother could have testified to the potential discrepancy.

Counsel said that, when he spoke with the Petitioner's mother, she focused primarily on disputes between the Petitioner and the mother of the children. Counsel agreed that the victims testified that the Petitioner's ex-girlfriend was present at the time when these offenses occurred. He said that he and the Petitioner determined that the ex-girlfriend worked at a local factory, but Counsel did not speak with her. Counsel testified he did not believe that she could corroborate the Petitioner's story regarding what had happened.

Counsel said that he called the victims' mother at trial because she had testified that she did not believe the children at the time that they reported the abuse.

The Petitioner testified that his mother and brother hired a law firm to draft the petition for post-conviction relief. He agreed that he and his post-conviction counsel had discussed the stronger and weaker points of his petition. The Petitioner said that he made Counsel aware of discrepancies between the victims' testimony during the preliminary hearing and their trial testimony. The Petitioner said that he told Counsel to speak with his

7

mother and several other people. Counsel did not indicate that he had done so. Counsel did tell him that the witness "Ms. Alexander," who was also the Petitioner's sister, was not an appropriate witness because of the offense against her son, who was also the Petitioner's nephew.

The Petitioner then made an unclear allegation that the State's attorney informed the jury during the trial that she and Counsel had "made a deal the night before [trial]." He indicated that the State's attorney "pranced" across the courtroom and indicated that she and Counsel had talked the night before and made a deal without the Petitioner's consent.

The Petitioner said that the victims had testified that there was a woman present in the home when the offenses occurred. He gave Counsel the woman's name, and Counsel did not interview her.

Counsel was recalled and testified that he and the State's attorney never made a deal before trial and that she had never so indicated in court.

The Petitioner did not offer any of the witnesses that he said that Counsel failed to interview.

Based on this evidence, the post-conviction court denied the petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner asserts that the post-conviction court erred when it denied his petition. He asserts that Counsel was ineffective for failing to interview potential witnesses before trial and for failing to call one of these potential witnesses to testify at trial. The State counters that, because the Petitioner did not present any of the witnesses at the post-conviction hearing, he has not met his burden of proof. We agree.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however,

8

we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner failed to present the testimony of any potential witnesses at the post-conviction hearing. It has long been held that we cannot speculate on what the testimony of any potential witness might have been if introduced. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Therefore, the Petitioner has failed to prove that Counsel was deficient by not calling any potential witness. As such, he is not entitled to relief on this issue.

## III. Conclusion

Based on the foregoing, we affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE

10